**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Christine M. Arguello**

Civil Action No. 08-cv-00656-CMA-CBS

REX E. FULLER,

      Plaintiff,

v.

SEAGATE TECHNOLOGY, LLC,

      Defendant.

---

## ORDER REGARDING MOTION FOR SUMMARY JUDGMENT

---

      This matter is before the Court on Defendant Seagate Technology, LLC's

Motion for Summary Judgment (Doc. # 29).   For the following reasons, the Motion

is GRANTED.

## <u>INTRODUCTION</u>

      This is an age discrimination lawsuit.  Plaintiff Rex Fuller alleges that Defendant,

his former employer, discriminated against him by terminating him in June 2006.

Plaintiff brings two claims for relief:  (1) Violation of the Colorado Anti-Discrimination

Act ("CADA"), and (2) Violation of the Age Discrimination in Employment Act ("ADEA").

Defendant moves for summary judgment in its favor and against Plaintiff on both claims.

The parties have fully briefed the Motion and it is now ripe for disposition.

## FACTUAL BACKGROUND

Unless otherwise noted, the following facts are undisputed.

## I.    PLAINTIFF'S EMPLOYMENT HISTORY

Defendant manufactures and sells computer hard drives.  Plaintiff began his employment with Defendant in 1996 in Longmont, Colorado, when Defendant acquired Plaintiff's then-employer, Conner Peripherals.  Plaintiff's job involved the "qualification" of customer products.  In laymen's terms, Plaintiff worked as a liaison between Defendant's sales people and engineers, and Defendant's customers (and their engineers), to ensure that Defendant's hard drives would work in customer products. At the time Defendant terminated him, Plaintiff held the title of Senior Business Development Manager, a job he had held in some capacity since 1998 or 1999.

When he first started working for Defendant, Plaintiff received rather mediocre performance reviews from his supervisors.  Emil Yappert, Plaintiff's first supervisor, gave him mostly "Meets Requirements" ratings, essentially a three-out-of-five score. Mr. Yappert also gave Plaintiff a "Nearly Meets Requirements" rating (*i.e.*, a two-out-of-five) in the areas of oral and written communications on two separate occasions, and gave him the same below-average rating once in the areas of planning and work organization, and organizational relationships.  In reviewing Plaintiff's performance, Mr. Yappert stated that Plaintiff could "improve his written communications by being much more concise, much less colloquial," and that Plaintiff relied too much on e-mail

communication "when direct face-to-face or phone communication would be more time efficient and appropriate." (Doc. # 29, Ex. D at 1.)

Plaintiff's reviews improved slightly under his next supervisor, Rob Jones. Mr. Jones' reviews included more ratings of "Meets Requirements" and "Exceeds Requirements" (*i.e.*, threes and fours out of five). However, by 2001, Plaintiff's performance again fell into the "Nearly Meets Requirements" rating in the areas of oral and written communications, analysis/problem solving, organizational relationships, collaboration, and effort/effectiveness. His next supervisor, Geoff Gorbold, gave Plaintiff a better review in 2002, ranking him the equivalent of three- and/or four-out-of-five in all areas.[1]

Plaintiff also had trouble communicating with co-workers, with one notable incident occurring in August 2003. Plaintiff introduced a co-worker, Elaina Bruce, to a group of engineers from an important customer as a "very good looking lady." Ms. Bruce felt embarrassed by Plaintiff's introduction because she felt that Plaintiff had demeaned her technical skills in front of the customer.[2] She complained to her supervisor, Yavette Brooks, about it, and Ms. Brooks forwarded Ms. Bruce's complaint to Plaintiff's supervisor, Paul Shekoski.

---

[1] Defendant had done away with the rating system that used "Nearly Meets Requirements," "Meets Requirements," and "Exceeds Requirements." However, Defendant continued to review its employees using a five-tiered system.

[2] The parties dispute the context of Plaintiff's introduction – Plaintiff claims that he was just making small talk to introduce Ms. Bruce, who was new to the customer. Defendant claims that the introduction led to an awkward situation that tarnished Ms. Bruce's reputation. However, this dispute is not material, the fact that Plaintiff was reprimanded is undisputed.

3

Although he did not formally discipline Plaintiff, Mr. Shekoski sent Plaintiff an e-mail noting that Plaintiff's "behavior cannot be supported by" Defendant. (Doc. # 29, Ex. G at 4.) Mr. Shekoski also suggested that Plaintiff reintroduce Ms. Bruce to the customer, discuss the situation with her, write her an apology, and "[l]ook hard at increasing the importance/priority of" Plaintiff's respect for his co-workers. (Doc. # 29, Ex. G. at 3.) Plaintiff discussed the matter one-on-one with Ms. Bruce, and the dispute dissipated without further managerial intervention. However, Ms. Bruce indicated that even after the one-on-one meeting with Plaintiff and Plaintiff's apology she preferred not to work with Plaintiff whenever possible.

Plaintiff's next supervisor, Heath Miller, also expressed his concerns to Plaintiff about Plaintiff's communication skills and unwillingness to own up to areas of responsibility. Mr. Miller stated the Plaintiff "struggled" to communicate with a key customer account Plaintiff had responsibility for handing, the MPC account. Mr. Miller felt that Plaintiff's communication deficiency was getting to the point where "there was the potential there that it was going to start impacting business, if it hadn't already. . . ." Mr. Miller noted that Plaintiff did eventually mend the situation with MPC, but Plaintiff still needed to improve his communication with co-workers.

In addition to the MPC issue, Mr. Miller recounted other problems he witnessed with Plaintiff's communications skills. For example, a dispute between Plaintiff and another employee, Mike Schneider, grew severe enough to merit intervention by Defendant's human resources managers. Another incident involved Plaintiff sending

4

a derogatory e-mail about one of his co-workers, Cindy Ryan, to Ms. Ryan and other

co-workers.  Once again, the dispute with Ms. Ryan proved severe enough to warrant

involvement by human resources.  Plaintiff eventually received a formal written warning

related to the incident with Ms. Ryan and coaching on his communications skills from

Mr. Miller.

Ms. Brooks took over as Plaintiff's supervisor in January 2006 and things did

not improve for Plaintiff.  Ms. Brooks received additional complaints about Plaintiff's

communications skills from co-workers and supervisors.  In January or February 2006,

Karl Chicca, a senior manager two levels above Ms. Brooks, pulled her aside from

a meeting and told her that sales personnel had complained about the support they

were receiving from Plaintiff.  Ms. Brooks also received complaints from Wen Lee

Wang, a technical customer manager, and Cy Bek, Wang's manager, that Plaintiff

had sent confusing and demeaning e-mails to Wang.  In February 2006, Ms. Brooks'

supervisor, Tom Major, received a request from Jim Phelps, Mr. Schneider's supervisor,

to remove Plaintiff from one of Plaintiff's largest accounts, the Gateway account,

because of the conflict between Plaintiff and Mr. Schneider.  However, Ms. Brooks

worked with Plaintiff and Mr. Phelps to resolve the issue with Mr. Schneider, and

Plaintiff remained on the Gateway account until he was terminated.

In contrast to the communications problems identified by Defendant, Plaintiff

points out that most of his evaluations, especially Mr. Miller's evaluation, contained

positive remarks, as well.  For example, Plaintiff received compliments for his innovative

manner of problem solving, and supervisors noted that he focused on resolving difficult qualification issues.  Plaintiff also received a 3% salary increase in the Fall of 2005.

As a result of the complaints and Plaintiff's history, Ms. Brooks discussed Plaintiff's problems with Ken Lamport, the human resources manager for Plaintiff's group.  Ms. Brooks did not conceal her dislike of Plaintiff from Mr. Lamport.  Indeed, she told him that she wanted to fire Plaintiff, but that she would follow the appropriate process to do so.  Ms. Brooks also consulted with Mr. Miller (Plaintiff's prior supervisor) about Plaintiff.  Mr. Miller showed her the 2005 written warning regarding the incident with Ms. Ryan, and forwarded her some of his e-mails reflecting his efforts to coach Plaintiff.  After consulting with Mr. Miller, Ms. Brooks talked with her supervisor, Mr. Major, and Mr. Lamport about putting Plaintiff on a Performance Improvement Plan ("PIP"), that is, she discussed the process that she would have to go through to terminate Plaintiff.  There is no evidence that Ms. Brooks made any comments about Plaintiff's age during this time period.

## II.   DEFENDANT'S EMPLOYMENT POLICIES AND PLAINTIFF'S TERMINATION

### A.   The PIP Policy

Defendant's employment policies provided for the implementation of a PIP when an employee "does not meet the expected standards in relation to job performance." (Doc. # 29, Ex. T.)  The PIP policy describes a progressive approach to dealing with underperforming employees.  (*Id.* at 5.)  First, Defendant will attempt to informally coach the employee.  Should that fail, Defendant will implement a PIP in three distinct stages.

6

Under the policy, stage one of the PIP may last up to 60 days, and stages two and three may last up to thirty days.  The policy explicitly allows Defendant to grant one extension of stage three for an additional thirty days.  If the employee has not improved his performance to Defendant's satisfaction by the completion of stage three (including the potential extension), Defendant has three options; it may:  (1) downgrade the employee's position; (2) terminate the employee; or (3) internally transfer the employee to another position.  The policy also states that the employee's manager should warn him of the consequences of continued poor performance and consult with human resources in administering the PIP.

Notwithstanding these policy guidelines, the PIP policy is explicitly flexible. The policy states that a PIP "should be administered flexibly, consistent with business necessity.  Nothing contained within this policy is intended to limit [Defendant's] ability to deal with performance issues, as it deems appropriate; performance issues may arise which require alternative, expedited corrected action, up to and including termination." (*Id.*)  For example, managers may place an employee into any stage of the PIP, depending on the nature and seriousness of the performance issue.  (*Id.*)

B.    Plaintiff's Termination

Given Plaintiff's well-document history of communications problems and co-worker complaints, notably the 2005 incident with Ms. Ryan, Ms. Brooks and

Mr. Lamport decided to place Plaintiff on the PIP at stage two.[3]  Ms. Brooks met with

Plaintiff on February 28, 2006, to discuss implementation of the PIP.  At that meeting,

they discussed the general competency areas that Ms. Brooks was seeking Plaintiff to

improve upon.  Ms. Brooks told Plaintiff that he needed to refrain from unprofessional,

negative emotional content in his e-mails, and that he should not send responses that

others could perceive as, "it is not my [Plaintiff's] job" or "the customers' requests are

not important."  Ms. Brooks provided Plaintiff with a document describing the PIP and

listing eight specific requests for improvement in Plaintiff's job performance.  (Doc. # 29,

Ex. X at 8.)

Plaintiff met again with Ms. Brooks and Mr. Lamport on March 20, 2006, to

review Plaintiff's progress under the PIP.  At this meeting, Ms. Brooks presented

Plaintiff with a bullet-point outline of problems she thought had remained since the

February meeting.  By way of example, the outline states that Plaintiff "continues to

struggle to demonstrate the Leadership required as a Senior Staff Account Manager,"

and that Plaintiff had sent a confusing e-mail to the sales team that required "multiple

emails to defuse confusion."  (Doc. # 29, Ex. BB.)  However, Ms. Brooks' outline did

note that Plaintiff had addressed four of the eight requests for improvement cited in the

February PIP document.

---

[3]   At his deposition, Mr. Lamport could not recall starting another employee at stage
two. However, as noted above, such a practice was not contrary to the terms of the PIP policy
guidelines.

Plaintiff met again with Ms. Brooks and Mr. Lamport on March 30, 2006.[4]   At this

meeting, Plaintiff presented Ms. Brooks with a written document describing his own plan

to resolve his performance issues.  Plaintiff wrote the document upon Mr. Lamport's

suggestion, thinking it would help explain Plaintiff's side of the story and move the

parties toward a resolution of the PIP.  However, Ms. Brooks did address Plaintiff's

submission with him and Plaintiff expressed disappointment at Ms. Brooks' reaction.

In addition to meeting with Plaintiff to discuss the PIP, Ms. Brooks requested

feedback regarding Plaintiff from co-workers and supervisors, and she closely

scrutinized his communications with customers and other employees.  In addition to

earlier complaints, in April 2006, Ms. Brooks received complaints regarding Plaintiff from

Matthew Dudgeon and Phil Coulston.  In March 2006, she e-mailed Plaintiff numerous

times concerning problems with his communications, including a lack of clarity in his

writing and inappropriate use of "reply to all."  Ms. Brooks also monitored Plaintiff's

attendance at meetings, and noted that he arrived late and without a notebook to

weekly meetings on the weeks of April 27, 2006, and May 4, 2006, and he left work

early without communicating with a manager on May 3, 2006.

Plaintiff blames his poor performance on a heavy workload.  He contends that he

did not receive adequate support from co-workers and was under "enormous pressure"

---

[4]   At this point, there is some dispute as to whether Ms. Brooks and Mr. Lamport had
decided to extend stage two of the PIP, or move Plaintiff into stage three.  Ms. Brooks stated
that she believed Plaintiff had progressed to stage three by this point, but Plaintiff contends that
he was not informed of this fact and he did not know that he had been moved into stage three
until his termination in June 2006.

in dealing with the Gateway account.  He states that he asked Ms. Brooks to reduce the number of accounts he handled, but there is a question of fact concerning whether Ms. Brooks responded to his request.  Plaintiff also requested that Defendant transfer him to another manager, but Mr. Major informed Plaintiff that a transfer was impossible since Ms. Brooks had already started the PIP process.  Defendant disputes Plaintiff's claims regarding a heavier-than-normal workload, and contends that he actually had one of the lighter loads in his group.

In any event, documents reflect that by May 15, 2006, Defendant had moved Plaintiff into stage three of the PIP, due to Plaintiff's "failure to make significant improvement" in the areas of communication and leadership.[5]  According to the "Employee Counseling Form" used to terminate Plaintiff, the final straw came on May 19, 2006.  The Form states that Plaintiff failed to follow Defendant's established shipping processes on a particular order, which resulted in the premature shipment of the order.  Defendant contends that it spent four days and many work hours to recover the incorrectly shipped order.  Plaintiff disputes whether he failed to follow Defendant's shipping policies – he says that he merely followed directions from another employee – but Plaintiff does not dispute that the order shipped prematurely or that Defendant spent time and money recalling the order from its customer.

---

[5]   Again, the Court should point out that there is a dispute as to whether Ms. Brooks or Mr. Lamport ever informed Plaintiff that Defendant had moved him into stage three.

In June 2006, Ms. Brooks met with Mr. Yappert, her new supervisor, regarding Plaintiff's termination.  Mr. Yappert signed off on the decision to terminate primarily on the basis of Ms. Brooks' recommendation and the supporting documentation. Ms. Brooks also informed Mr. Major, her former supervisor, of Plaintiff's termination, and Mr. Major did not object.  Ms. Brooks had also discussed Plaintiff's termination with Mr. Lamport, so when the decision was made, Ms. Brooks, Mr. Yappert, and Mr. Lamport all signed the Employee Counseling Form ending Plaintiff's employment.[6] (Doc. # 29, Ex. II at 1.)  Defendant terminated Plaintiff in a rather curt meeting on June 9, 2006.

The Employee Counseling Form given to Plaintiff stated that he had not:

> made the necessary improvements in Leadership, Communication and Teamwork.  He continues to need day-to-day direction on basic tasks. He has not kept up-to-date with the plans for the products.  This has caused ongoing problems with the customers as well as with the Product Teams.  [Plaintiff] is not performing consistent with the expectations for a Senior Staff Account Manager. * * *  [Plaintiff's] performance has not improved to an acceptable standard and his employment will be terminated.

(*Id.*)  Although a space was provided on the form for his signature, Plaintiff did not sign the document.

---

[6]  There is also some indication in the record that Mr. Chicca, the manager two levels above Ms. Brooks, approved the termination, although Plaintiff disputes this and Mr. Chicca's name is not listed on the Counseling Form.

C.    Plaintiff's Replacement

On the date of his termination, Plaintiff was 59 years old; Ms. Brooks was 42 years old; Mr. Lamport was 63 years old; Mr. Yappert was 48 years old; and Mr. Chicca was 49 years old.  Following Plaintiff's termination, Ms. Brooks assigned one of her current employees, Ric Vesely, to handle Gateway notebook products, which was half of Plaintiff's primary account, Gateway.  Mr. Vesely was 37 years old at the time. Around that same time, Alex Ishimi, a 32-year-old employee from another group, assumed responsibility for the other half of the Gateway account, desktop products. Shortly thereafter, Mr. Ishimi assumed responsibility for Gateway's notebook products, too.  In other words, Defendant did not "hire" a new employee to replace Plaintiff, but transferred Mr. Ishimi into the group to assume Plaintiff's responsibilities on the Gateway account.

## III.    AGE-RELATED EVIDENCE

Plaintiff points to a number of age related facts, including statistical evidence and statements from supervisors.

A.    Statistical Evidence

Defendant's discovery responses reflect a middle-aged workforce at Defendant's Longmont facility.  On June 8, 2006, the median age of employees at the Longmont facility was 44 years.  Since January 1, 2003, the median age of the nine employees at the Longmont facility put on PIP plans has been 56.8 years.  The parties dispute the exact median age of the employees terminated from Defendant's Longmont facility

12

since January 1, 2003.  Regardless of their dispute, it also appears to be well over 40 years.

Plaintiff also relies on various statistics from a 2008 study conducted by Defendant entitled, "Critical Skills Retention for an Aging Workforce" ("Critical Skills Study").  Defendant commissioned the Critical Skills Study to determine whether the older nature of Defendant's workforce presented a long-term business problem, *e.g.,* loss of institutional knowledge, as older workers retired.  The exact parameters of the data used in the Critical Skills Study are rather nebulous, but the parties agree that it contains at least some data dating to 2002.  However, other data from the Study dates back only to 2007, the year after Defendant terminated Plaintiff.

Certain drafts of the Critical Skills Study indicate that older workers, those over 55 years old, had a less likely chance of receiving an "Outstanding" performance rating than did younger workers.  According to the Critical Skills Study, in 2008, Defendant employed 3827 Boomers (workers born between 1946 and 1964), versus only 2512 from Gen X (workers born between 1965 and 1983).  Drafts of the Study also indicate that between fiscal years 2004 and 2006, Defendant terminated 612 Boomers, whereas Defendant terminated only 209 workers from Gen X.  However, the Study provides no explanation for the terminations.  The Critical Skills Study also reflects that older workers were less likely to voluntarily leave their jobs than younger workers, but again, the Study offers no explanation for the discrepancy.

B.      Age-Related Comments and Disparate Treatment

Plaintiff identifies two statements made by supervisors regarding his age, although Defendant questions the veracity and/or relevance of both statements.

First, Plaintiff recalls Mr. Shekoski telling him in 2003 that members of management, including Ms. Brooks and possibly Mr. Miller, questioned whether Plaintiff would retire after serious back surgery that he underwent in August of that year.

Second, Plaintiff alleges that in August or September 2005, Mr. Miller said something along the lines of, "it just kills me and the other younger managers that you [Plaintiff] and the other 'old farts' are making more money than us."  Mr. Miller admits that he may have had a conversation with Plaintiff regarding salary,[7] but he expressly denies that he used the term "old farts," or that he would have referred to Plaintiff's age in any way.

Ms. Brooks never made any age-related comments to Plaintiff, but Plaintiff claims that she treated younger workers more favorably.  He alleges that she reduced their workload and allowed them to work from home, miss meetings, or show up late, and that he did not receive this special treatment.  Defendant disputes these allegations and notes that Plaintiff cannot identify any facts implying that, even if Ms. Brooks did treat other workers more favorably, she treated them better because of their age.

---

[7]  Mr. Miller had just completed Plaintiff's review and told him his salary for the next year.

## PROCEDURAL HISTORY

Plaintiff filed a complaint in state court on March 7, 2008, and Defendant timely removed the action to this Court on March 31, 2008.  (Doc. # 1.)  Defendant answered the complaint and the parties began to conduct discovery.  (Doc. # 9.)  Defendant filed the instant Motion for Summary Judgment on January 30, 2009.  (Doc. # 29.)  Plaintiff filed his response in opposition to summary judgment on February 27, 2009 (Doc. # 38), and Defendant replied in support of summary judgment on March 20, 2009.  (Doc. # 41.)

On the same day that Defendant filed the Motion for Summary Judgment, Plaintiff filed a Motion to Compel Defendant to disclose the author of certain portions of the Critical Skills Study called "Talk Bubbles."  (Doc. # 27.)  However, the Magistrate Judge denied Plaintiff's Motion to Compel without prejudice for failure to comply with the Court's practice standards.  Notwithstanding the Magistrate Judge's decision, issues regarding Defendant's evidence, including the authorship of the talk bubbles re-emerged when Defendant filed its reply brief.  (*See* Docs. # 41 & 42.)  Defendant attached supplemental discovery responses to its reply brief.  (Doc. # 41, Ex. WW.)  The supplemental responses related in part to the average age of workers terminated by Defendant.  (*Id.*)  Plaintiff moved to strike portions of Defendant's reply brief on the grounds that Defendant should have disclosed the supplemental responses earlier.  (Doc. # 42.)  In the motion to strike, Plaintiff also sought to stay consideration of the

motion for summary judgment until Defendant completed an internal investigation into the authorship of the talk bubbles.  (*Id.*)

The Court granted in part and denied part the motion to strike, declining to strike the supplemental responses, but allowing Plaintiff to file a sur-reply to address the issue.  The Court also forestalled ruling on the motion for summary judgment until Defendant could advise the Court regarding its investigation into the authorship of the talk bubbles.  Plaintiff filed a sur-reply on July 20, 2009 (Doc. # 54), and Defendant provided the Court with a status report on July 22, 2009.  (Doc. # 56.)  Thus, the Motion for Summary Judgment is now ripe for disposition.[8]

## STANDARD OF REVIEW

Courts should grant summary judgment if the record indicates that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *Deepwater Investments, Ltd. v. Jackson Hold Ski Corp.*, 938 F.2d 1105, 1110-11 (10th Cir. 1991); *Devery Implement Co. v. J.I. Case Co.*, 944 F.2d 724, 726 (10th Cir. 1991).  The moving party bears the initial burden of demonstrating the lack of an issue of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the movant meets this burden, the non-movant must respond with evidence sufficient to create a genuine issue of material fact for trial.  *Id.* at 324;

---

[8]   The Court considers that Motion for Summary Judgment ripe notwithstanding the fact that Plaintiff has moved to strike Defendant's status report as argumentative.  (Doc. # 57.) Because the Court can decide for itself whether to address the argumentative portions of the status report, it need not strike the status report.  Moreover, given the Court's ruling on Motion for Summary Judgment, the Motion to Strike is a moot point.

16

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). To overcome a motion for summary judgment, the non-moving party must present enough evidence to allow a reasonable jury to find in its favor.  *Vitkus v. Beatrice Co.*, 11 F.3d 1535, 1539 (10th Cir. 1993).  In analyzing the evidence on a motion for summary judgment, a court should view the factual record and draw reasonable inferences in favor of the non-moving party.  *Kidd v. Taos Ski Valley, Inc.*, 88 F.3d 848, 851 (10th Cir. 1995).

## DISCUSSION

Plaintiff alleges two claims, one under the CADA, and one under the ADEA. However, the Court applies the same legal standard to both the state and federal claims.  *See Bodaghi v. Department of Natural Resources*, 995 P.2d 288, 297-98 (Colo. 2000) (adopting framework from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) for use in CADA claims)).  Thus, the Court will not address Plaintiff's CADA claim separately.

## IV.   APPLICABLE LAW – ADEA

The ADEA prohibits an employer from terminating an individual "because of such individual's age."  *See* 29 U.S.C. § 623(a)(1).  "To establish a disparate-treatment claim under the plain language of the ADEA, therefore, a plaintiff must prove that age was the 'but-for' cause of the employer's adverse decision."  *Gross v. FBL Fin. Servs., Inc.*, ____ U.S. ____, 129 S. Ct. 2343, 2350 (2009).  A plaintiff may prove causation using either

direct or circumstantial evidence of discrimination.  *See id.* at 2351; *see also Riggs v. AirTran Airways, Inc.*, 497 F.3d 1108, 1114 (10th Cir. 2007).

In the Tenth Circuit, when a plaintiff relies on circumstantial evidence to establish discrimination, courts should use the *McDonnell Douglas* three-step analysis to determine whether summary judgment is appropriate.  *See Riggs*, 497 F.3d at 1114; *Timmerman v. U.S. Bank, N.A.*, 483 F.3d 1106, 1113 (10th Cir. 2007).[9]  Under *McDonnell Douglas*, the plaintiff must come forward with enough evidence to state a *prima facie* case of discrimination.  411 U.S. at 802; *Timmerman*, 483 F.3d at 1113. In an age discrimination case like this one, the plaintiff must establish four elements to state a *prima facie* case.  Plaintiff must establish that:  (1) he was a member of a protected class (*i.e.*, he was over 40 years old); (2) he was doing satisfactory work; (3) he was terminated; and (4) his position was filled by a younger person.  *See Rivera v. City & County of Denver*, 365 F.3d 912, 920 (10th Cir. 2004) (quoting and citing *McKnight v. Kimberly Clark Corp.*, 149 F.3d 1125, 1128 (10th Cir. 1998)).

If the plaintiff is successful on this first step, the defendant may present a legitimate, non-discriminatory reason for the termination to obtain summary judgment

---

[9]  In *Gross*, Justice Thomas pointed out that the Supreme Court has not "definitively decided whether" the *McDonnell Douglas* framework applies in ADEA cases.  129 S.Ct. at 2349 n.2.  Nonetheless, this Court finds nothing in Justice Thomas' opinion that would alter the widespread use of the *McDonnell Douglas* framework to decide whether summary judgment is appropriate in ADEA cases.  *See Misner v. Potter*, 2009 WL 1872598, *2 n.2 (D. Utah June 26, 2009) ("The court notes that the Supreme Court has recently issued an opinion discussing the burden of persuasion under the ADEA . . . .  Regardless, the court does not understand *Gross* to alter the use of the *McDonnell Douglas* framework at summary judgment on ADEA cases."); *see also Martino v. MCI Comms. Servs., Inc.*, ___ F.3d ___, 2009 WL 2224914 (7th Cir. July 28, 2009) (applying *McDonnell Douglas* framework after *Gross*).

against the plaintiff's claim.  411 U.S. at 802; *Timmerman*, 483 F.3d at 1113.  Assuming

the defendant can articulate such a reason, to survive summary judgment, the plaintiff

must then come forward with evidence establishing that the defendant's proffered

reason was merely pretext for discrimination.  *Timmerman*, 483 F.3d at 1113.

A plaintiff may show pretext by demonstrating "weaknesses, implausibilities,

inconsistencies, incoherencies, or contradictions" in the defendant's legitimate, non-

discriminatory reason.  *Morgan v. Hilti*, 103 F.3d 1319, 1323 (10th Cir 1997); *see also*

*Timmerman*, 483 F.3d at 1113; *Rivera*, 365 F.3d at 925.  Plaintiffs may present various

types of evidence to establish pretext, *e.g.* a defendant's failure to follow its own

policies, use of subjective criteria in the termination decision, or disparate treatment

of similarly situated employees.  *See Riggs*, 497 F.3d at 1119; *see also McDonnell*

*Douglas*, 411 U.S. at 804-05 (discussing methods of proving pretext, including disparate

treatment and statistical evidence).

However, courts should not ask whether a defendant's decision to terminate

a plaintiff was smart, fair, or correct.  Instead, courts must limit their inquiry to whether

the proffered reasons for the decision were honest and whether the defendant relied

on them in good faith.  *See Riggs*, 497 F.3d at 1118 (citing *Timmerman*, 483 F.3d at

1120)).  Indeed, "[e]ven a mistaken belief can be a legitimate, non-pretextual reason

for an employment decision."  *Piercy v. Maketa*, 480 F.3d 1192, 1200 (10th Cir. 2007).

In short, courts should not rely on the benefit of hindsight to second-guess a

defendant's employment decision if it appears that the defendant acted on an honestly

19

held business judgment.  *See Young v. Dillon Cos., Inc.*, 468 F.3d 1243, 1250 (10th Cir. 2006) (noting that courts should not act as "super personnel department[s]") (citing *Jones v. Barnhart*, 349 F.3d 1260, 1267 (10th Cir. 2004)).

## V.     *PRIMA FACIE* CASE

In this case, Defendant concedes that Plaintiff can meet the first and third elements of his *prima facie* case, *i.e.*, Plaintiff was over 40 years old and he was terminated.  However, Defendant contends that Plaintiff has failed to establish the second and fourth elements of a *prima facie* case of age discrimination because: (1) Plaintiff was not doing satisfactory work, and (2) Defendant did not replace Plaintiff with a younger employee.  Plaintiff responds that he was doing satisfactory work, as demonstrated by the various positive reviews prior to Ms. Brooks assuming supervision of him, and supportive comments from co-workers, including Mr. Schneider, the co-worker with whom Plaintiff had serious disputes in late 2005 over the Gateway account.  Plaintiff also contends that, even if Defendant did not hire a new employee to take over Plaintiff's job, Defendant did replace Plaintiff with a younger worker, Mr. Ishimi.  The Court need not address these arguments in much depth because it concludes that, even if Plaintiff can make out a *prima facie* case, Plaintiff has not presented sufficient evidence to survive the second and third steps of the *McDonnell Douglas* analysis.

VI.     **LEGITIMATE, NON-DISCRIMINATORY REASON AND PRETEXT**

Defendant argues that, regardless of whether Plaintiff can establish a *prima facie*

case, it had a legitimate, non-discriminatory reason to terminate Plaintiff – his poor job

performance.  Defendant further argues that Plaintiff cannot prove that this non-

discriminatory reason was a pretext for age discrimination.  The Court agrees with

Defendant.

A.     <u>Defendant Has Established a Legitimate, Non-Discriminatory Reason</u>.

For the following reasons, the Court concludes that Defendant has established

that Plaintiff's poor performance in the areas of communication, leadership, and

teamwork is a legitimate, non-discriminatory reason for his termination.

Going back as far as the late 1990s, when Plaintiff worked under Mr. Yappert,

Plaintiff received less than average performance ratings in these performance skill

areas.  Although his reviews improved over the course of the next few years, Plaintiff

did not go long without being implicated in a serious incident.  For example, Plaintiff had

the dispute with Ms. Bruce over his marginally discriminatory and less-than-professional

introduction of her to a customer in 2003, the incident involving the improper use of

e-mails with Ms. Ryan in early 2005, and the dispute with Mr. Schneider in late 2005

and early 2006.  Counseling and coaching by Plaintiff's supervisors did not improve

Plaintiff's performance.  Indeed, Ms. Brooks and other supervisors noted that Plaintiff's

problems with unprofessional communications and lack of leadership continued until his

termination.  Indeed, in evaluating Plaintiff during the PIP process in 2006, Ms. Brooks

received complaints from at least nine people regarding Plaintiff's insufficiencies in the areas of communications and leadership.  Ms. Brooks also noted Plaintiff's poor e-mail skills in her feedback to Plaintiff in early 2006.

Plaintiff takes issue with Defendant's attack on his job performance.  However, this Court should not second guess Defendant's personnel decisions.  *See Riggs*, 497 F.3d at 1118 (noting that courts should not question employer's good faith business decision).  Thus, Plaintiff's own feelings regarding his performance are largely irrelevant to Defendant's proffered reason for termination, and, notwithstanding the statements of Plaintiff's supporters, the mound of undisputed evidence relating to Plaintiff's poor job performance leads this Court to conclude that Defendant has articulated a legitimate, non-discriminatory reason for terminating Plaintiff in June 2006.

B.    Plaintiff Cannot Establish Pretext.

Plaintiff argues that Defendant's proffered reason for termination is pretextual for three reasons.  First, Plaintiff contends that Defendant fabricated the reason for termination because Plaintiff actually complied with the conditions of his PIP, and the working relationship between himself and his co-workers had improved by June 2006. Second, Plaintiff contends that Defendant failed to follow its own PIP policy guidelines, suggesting that Defendant used the PIP as a cover to discriminate against Plaintiff. Third, Plaintiff contends that the statistics and quotes from the Critical Skills Study raise an inference that Defendant sought to terminate older workers.  None of these arguments establish pretext in this case.

22

      1.     *Defendant Acted on Good Faith Belief in Terminating Plaintiff*.

Regarding Plaintiff's contention that the evidence in the record does not comport with Defendant's stated reason for termination, Plaintiff has not shown that Ms. Brooks lied in stating that she terminated Plaintiff because of his poor job performance. In Ms. Brooks' opinion, Plaintiff's job performance started out poor in 2006 and did not improve significantly under the PIP.  The documents she created memorializing her concerns with Plaintiff's job performance before and after she placed Plaintiff on the PIP serve as ample evidence that she thought Plaintiff did not meet Defendant's standards. For example, she sent Plaintiff at least three e-mails in early 2006 describing problems she found with Plaintiff's communications.  The Employee Counseling Form used to document Plaintiff's termination also notes the shipping incident from May 2006 as the most recent example of Plaintiff's poor work performance.  Although Plaintiff disputes whether the shipping incident was really his fault, he does not present any evidence to suggest that Ms. Brooks fabricated the shipping incident or the other problems she noted in her e-mails to him as a cover to terminate him on the basis of his age.

Moreover, as noted above, Plaintiff received many sub-par performance reviews and numerous complaints from co-workers and supervisors regarding his job performance.  These complaints were not isolated or limited to a single time period, co-worker, or supervisor.  Indeed, Plaintiff had problems with multiple co-workers and supervisors long before Ms. Brooks took over supervision of Plaintiff, and long before Plaintiff asserts that he become overworked by the Gateway account.  The Court cannot

ignore this lengthy history of poor job performance when analyzing whether Ms. Brooks'

acted in good faith when she terminated Plaintiff or whether she used his job

performance as pretext for discrimination.

Plaintiff also contends that Ms. Brooks changed the tone of her complaints during

the PIP process, but that contention is not supported by the evidence.  From the

beginning of her tenure as Plaintiff's supervisor, Ms. Brooks perceived deficiencies in

Plaintiff's communications skills and teamwork.  These are the very same deficiencies

that lead Ms. Brooks to ultimately recommend Plaintiff's termination.  Notwithstanding

the fact that Ms. Brooks might have altered her description of Plaintiff's performance

slightly throughout the course of the PIP process, her problems with Plaintiff remained

largely the same throughout 2006.

In other words, although Plaintiff believes that his performance improved

under the PIP, he has not presented evidence to establish that Ms. Brooks (or other

supervisors) felt the same way.  Thus, Plaintiff cannot show that Defendant did not

act in good faith when it terminated Plaintiff for his sub-standard job performance.

*See Piercy*, 480 F.3d at 1200 (even mistaken, good faith beliefs regarding the basis

for an employment decision can be non-pretextual).

2.      *Defendant's PIP Policy Was Flexible.*

Plaintiff also argues that Defendant failed to comply with its own PIP policy and

this failure supports a finding of pretext.  *See, e.g., Campbell v. Gambro Healthcare,*

*Inc.*, 478 F.3d 1282, 1291 (10th Cir. 2007) ("An employer's failures to follow written or

unwritten policy may support a showing of pretext, particularly if other similarly-situated employees were treated differently.").  Plaintiff contends that Defendant deviated from the PIP policy by failing to notify him of the performance deficiencies that caused his termination, failing to notify him of his advancement from stage two to stage three, and starting him at stage two of the PIP.

Defendant does not dispute that Mr. Lamport could not recall starting another employee's PIP at stage two, and that the timing of the stages for Plaintiff's PIP does not match up with the PIP policy's suggested thirty-days-per stage progression. Thus, to the extent that "standard" PIP procedures exist, Plaintiff correctly notes that Defendant did not follow the letter of those procedures in his case.

However, Defendant correctly points out that the PIP policy provides mere "guidelines," not rigid rules that Defendant must follow in every circumstance.  The PIP policy contains multiple provisions allowing Defendant to administer a PIP flexibly and in line with whatever business or personnel needs may arise.  For example, the guidelines states that nothing in the policy "is intended to limit [Defendant's] ability to deal with performance issues, as it deems appropriate; performance issues may arise which require alternative, expedited corrective action, up to and including termination."  (Doc. # 29, Ex. T at 5.)  In fact, Defendant could have terminated Plaintiff at any time as a result of his performance issues and still complied with the PIP policy guidelines.

Moreover, evidence in the record explains Defendant's deviations from the standard PIP guidelines and militates against a finding of pretext.  To wit, Plaintiff's

25

numerous sub-par performance reviews; previous, documented conflicts with co-workers; and failure to respond to coaching by his supervisors all support Defendant's decision start Plaintiff at stage two.  Additionally, Plaintiff's complaints regarding a lack of feedback from Ms. Brooks during the PIP are contradicted by the multiple meetings and e-mails regarding Plaintiff's job performance while he was on the PIP.  Likewise, the fact that Plaintiff's PIP stages lasted longer than thirty days does not raise an inference of discrimination.  In fact, the lengthened stages benefitted Plaintiff by giving him a greater opportunity to improve his skills before facing negative consequences.

The record discloses only one unexplained derogation from the PIP policy that might support Plaintiff's argument, Defendant's failure to clearly notify Plaintiff that he was being advanced from stage two to stage three.  However, Plaintiff knew that his employment was tenuous after the three meetings with Ms. Brooks in February and March 2006.  Thus, although Defendant may not have informed Plaintiff as clearly as it could have under the PIP policy guidelines, any dispute regarding when Defendant informed Plaintiff that he was being moved from stage two to stage three is simply not material enough to support a finding of pretext.

Plaintiff has also failed to present any evidence establishing that Defendant's administration of his PIP differed from the administration of a PIP for similarly situated younger workers.  Notwithstanding the fact that Mr. Lamport could not recall starting another employee at stage two, Plaintiff has not shown that any of the other workers Mr.

26

Lamport recalled starting on a PIP had the same longstanding history of perform-ance issues that Plaintiff had in his file.

Thus, to the extent that Defendant varied from the written PIP guidelines in terminating Plaintiff, Defendant's *de minimis* variations do not raise an inference of pretext.

### 3.     *Statistical Evidence Does Not Support Pretext.*

Regarding Plaintiff's argument that various statistics relating to Defendant imply discrimination, the Court again concludes that the statistics do not raise a question regarding pretext.

Plaintiff may use statistical evidence of a disparity between himself and similarly situated workers to create an inference that Defendant discriminated against him. *See Fallis v. Kerr-McGee Corp.*, 944 F.2d 743, 746 (10th Cir. 1991).  However, the statistical evidence must be drawn from a large enough pool to be reliable and it must "show a significant disparity and eliminate nondiscriminatory explanations for the disparity."  *Id.*; *see also Furr v. Seagate Tech.*, *Inc.*, 82 F.3d 980, 986-87 (10th Cir. 1996) ("While statistical evidence may create an inference of discrimination, the evidence may be so flawed as to render it insufficient to raise a jury question."). Statistical evidence that merely lumps together employees regardless of individual characteristics that may explain any disparities will not suffice to show pretext. *See Furr*, 82 F.3d at 987 ("Statistical evidence which fails to properly take into account

nondiscriminatory explanations does not permit an inference of pretext.") (citing *Rea v. Martin Marietta Corp.*, 29 F.3d 1450, 1456 (10th Cir. 1994)).

In this case, Plaintiff has culled random bits of statistical evidence from the Critical Skills Study and Defendant's discovery responses in an attempt to show that Defendant had a company-wide mandate to fire older workers.  For example, Plaintiff claims that between 2004 and 2006, Defendant involuntarily terminated three times as many Boomers as it did workers from Gen X.

Defendant does not dispute the accuracy the raw data contained in the Study or the discovery responses; nor does Defendant dispute that some disparities between older and younger workers exist, and the Court's own calculations confirm some disparities.  Relying on the statistical evidence in the record, the Court finds that in Defendant's 2008 fiscal year, workers born before 1965 made up approximately 61.3% of Defendant's "IDL Count," which the Court will use as a proxy for the total workforce, whereas workers born before 1965 made up approximately 81.1% of the involuntary terminations that year-to-date.[10]

However, Defendant contends that Plaintiff has pulled the data out of context and strategically misapplied it.  The Court agrees with Defendant that Plaintiff's statistical analysis is imprecise, inaccurate, and insufficient to create an inference of age

---

[10]   The Court should point out that these percentages are merely illustrative of the type of disparity alleged by Plaintiff.  However, as Defendant argues and this Court recognizes, these disparities rely on statistically incomparable data pools.  To wit, the total number of workers in this example, the IDL Count, appears to be limited by different parameters than the total number of involuntary terminations.  Again, this is merely an example, and the Court does not intend this example to reflect the undisputed facts of the case.

discrimination.  Indeed, Plaintiff relies on incomparable sets of data to create numerical

disparities that are statistically inaccurate and misleading, *e.g.*, comparing data

regarding Defendant's median aged employees from fiscal year 2006 to data regarding

the median age of employees placed on a PIP from fiscal year 2003.  Plaintiff's faulty

statistical methodology drastically undercuts the inference Plaintiff hopes to raise.[11]

Moreover, even if Plaintiff had used more reliable statistical comparisons, Plaintiff

does not compare similarly situated workers.  Therefore, Plaintiff fails to adequately

explain or attempt to eliminate potentially nondiscriminatory reasons for the disparities

he identifies.  Plaintiff's evidence is not broken down by job position and/or

responsibilities, level of seniority, performance reviews, different decision-makers, or

other trends that may affect Defendant's younger workers differently from Defendant's

older workers.  Thus, Plaintiff's citation to a random smattering of statistics, even if it

shows numerical disparities, does not raise a jury question regarding pretext because

the statistical evidence is too flawed to support an inference of discrimination.  *See Furr*,

82 F.3d at 987.

The same issues plague Plaintiff's citation to the Critical Skills Study because

the numbers contained in the study are not sufficiently reliable to support an inference

of pretext.  Plaintiff attempts to use the Critical Skills Study in the same manner that a

party would typically use an expert report.  But, as Defendant points out, the Critical

---

[11]    At this point, the Court is reminded of the phrase regarding statistics made popular
by Mark Twain, "There are three kinds of lies:  lies, damned lies, and statistics."

Skills Study did not commence until after Plaintiff's termination, and the undisputed goal of the Study made it only minimally relevant to Plaintiff's case.  Thus, both the data and the hotly-disputed talking bubbles are largely irrelevant to Plaintiff's claims because they were created after his termination and bear no relation to any particular issue in Plaintiff's case.  Assuming *arguendo*, that the talking bubbles are somehow relevant, very few of the bubbles support an inference of discrimination.  In fact, many of the bubbles raise the opposite inference, *i.e.*, that Defendant was worried about maintaining the viability of its older workers, not getting rid of them.

In short, Plaintiff has cherry-picked a number of unrelated statistics regarding the age of Defendant's U.S. workforce and attempted to parlay these statistics into a large disparity between older and younger workers.  However, the methodological defects with Plaintiff's statistical data render it insufficient to raise a jury question regarding whether Defendant's stated reason for termination was merely a pretext for age discrimination.

## VII.    CAUSATION

In light of the Supreme Court's recent decision in *Gross*, the Court feels compelled to address another deficiency in Plaintiff's case that merits summary judgment in favor of Defendant.  Although the Tenth Circuit Court of Appeals has not addressed it, this Court interprets *Gross* as elevating the quantum of causation required under the ADEA.  After *Gross*, it is no longer sufficient for Plaintiff to show that age was a motivating factor in Defendant's decision to terminate him.  Instead, Plaintiff must

present evidence establishing that age discrimination was the "but for" cause of Plaintiff's termination.  129 S. Ct. at 2350.

In this case, Plaintiff has not presented one piece of evidence that would directly or inferentially link Defendant's termination of him to a desire to discriminate by the decision-makers involved, notably Ms. Brooks, Mr. Lamport, or Mr. Yappert.  Plaintiff has simply disputed Defendant's reasons for his termination to create largely irrelevant questions of fact and then scrounged through the bottom of the evidentiary barrel in the hope of raising an inference of discrimination.  However, given the paucity of Plaintiff's evidence tying his termination to a discriminatory animus, the Court concludes that no reasonable jury could find that Plaintiff's termination would not have occurred but for Defendant's desire to discriminate.  Thus, under *Gross*, the Court holds that summary judgment is appropriate.

## CONCLUSION

Although Plaintiff arguably could establish a *prima facie* case of age discrimi-nation, Defendant has come forward with a legitimate non-discriminatory reason for Plaintiff's termination that Plaintiff cannot overcome.  The Court also concludes that Plaintiff cannot raise a triable issue of fact regarding whether age discrimination was the "but for" cause of his termination. Thus, summary judgment against Plaintiff is appropriate.

Accordingly, Defendant's Motion for Summary Judgment (Doc. # 29) is GRANTED.

It is FURTHER ORDERED that Plaintiff's Motion to Strike (Doc. # 57) is DENIED AS MOOT; it is

FURTHER ORDERED that this case shall be DISMISSED WITH PREJUDICE, each side to bear his or its own costs; and it is

FURTHER ORDERED that the Final Trial Preparation Conference set on October 16, 2009 and the five-day jury trial set to commence October 26, 2009 are hereby VACATED.

DATED:  August __19__, 2009

BY THE COURT:

_____
CHRISTINE M. ARGUELLO
United States District Judge